1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY ELL SHEHEE, | Case No. 1:14-cv-00005-NONE-BAM (PC) |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| PAMELA AHLIN, *et al.*, | (ECF No. 79) |
| Defendants. | **FOURTEEN (14) DAY DEADLINE** |

## I.     Introduction

Plaintiff Gregory Ell Shehee ("Plaintiff") is a former state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on Plaintiff's third amended complaint against Defendants Nguyen and Estate of J. Tur for inadequate medical care while Plaintiff was a civil detainee, arising from events occurring prior to Plaintiff's surgery in April 2013,[1] in violation of the Fourteenth Amendment.

This case has a long procedural history, which the Court will not fully repeat here. However, as noted below, Plaintiff raises issues related to service on Defendant Tur and the later substitution of Defendant Estate of J. Tur. A more detailed background of those events, as well

---

[1] There is some ambiguity in the record as to the year of Plaintiff's surgery. On February 27, 2017, the Ninth Circuit Court of Appeals remanded this matter for further proceedings regarding Plaintiff's medical care under Dr. Tur and Defendant Nguyen prior to his surgery in April 2014. (ECF No. 34.) However, as all medical records presented to the Court indicate that Plaintiff's surgery occurred on April 4, 2013, the Court will proceed with this date.

1

1   as the Court's resolution of those issues on the merits, can be found in the Court's January 10,

2   2019 order setting aside entry of default and substituting Estate of J. Tur for Defendant Tur.

3   (ECF No. 85.)

4          Currently before the Court is Defendants' motion for summary judgment, filed September

5   28, 2018.[2]  (ECF No. 79.)  Defendants filed an amended declaration of Dr. Szabo in support of

6   the motion, to include referenced exhibits and attachments, on October 1, 2018.  (ECF No. 81.)

7   Following re-service of the motion for summary judgment on January 14, 2019, (ECF Nos. 86,

8   87), and several extensions of time, Plaintiff filed his opposition on May 14, 2019, (ECF No.

9   100).  Defendants did not file a reply, and the time to do so expired on May 21, 2019.  The

10  motion was deemed submitted on that date.  Local Rule 230(l).

11         On July 26, 2019, Plaintiff submitted ten separate filings apparently in opposition to the

12  pending motion for summary judgment.  (ECF Nos. 105–114.)  On August 28, 2019, Plaintiff

13  filed another document which he refers to as an opposition to the motion for summary judgment,

14  as well as his own motion for summary judgment.  (ECF Nos. 115, 116.)  On September 25, 2019

15  and October 11, 2019, Plaintiff filed two more documents, also apparently in opposition to the

16  pending motion for summary judgment.  (ECF Nos. 118, 119.)  Defendants did not file a response

17  to any of these later filings or motions.

18         For the reasons set forth below, the Court recommends that Defendants' motion for

19  summary judgment be granted.

20  **II.     Plaintiff's Supplemental Oppositions**

21         As noted above, between July 26, 2019, and October 11, 2019, months after briefing had

22  closed on Defendants' motion for summary judgment, Plaintiff filed fourteen additional

23  documents, variously styled as oppositions to Defendants' summary judgment motion, Plaintiff's

24  own motion for summary judgment, or Plaintiff's memorandum of points and authorities in

25  support of Plaintiff's declaration to his opposition to Defendant's summary judgment motion.

26  (ECF Nos. 105–114, 115–116, 118–119.)  However, Plaintiff had already filed his opposition to

27  ---
[2] Concurrent with the motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment.  (ECF No. 79, pp. 2–3.); see Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v. Rowland,

28  154 F.3d 952, 957 (9th Cir. 1988); Klingele v. Eikenberry, 849 F.2d 409, 411–12 (9th Cir. 1988).

1   Defendant's motion for summary judgment on May 14, 2019. (ECF No. 100). Plaintiff did not

2   seek permission to file additional or supplemental oppositions, nor did the Court grant Plaintiff an

3   extension of time or leave to file them.

4         As such, the Court finds the additional filings are both untimely and unauthorized.

5   However, in an abundance of caution, the Court has reviewed the submitted filings. The majority

6   of Plaintiff's filings are largely irrelevant to the substance of the pending summary judgment

7   motion. Many of the filings are in opposition to the Court's setting aside of the entry of default

8   against Defendant Tur, the substitution of Estate of J. Tur as a party to this action, and the Office

9   of the Attorney General's representation of Estate of J. Tur. (ECF Nos. 105, 110, 116, 118–119.)

10  As discussed in prior orders, the Court has addressed the merits of these issues and finds that

11  Plaintiff has not presented any new basis for reconsideration of these decisions. (See ECF Nos.

12  85; 92, p. 2; 97, pp. 2–3.)

13        Plaintiff's remaining "oppositions" are exhibits not referenced or incorporated by

14  reference to any other filings, (ECF Nos. 106–109, 114, 115), or copies of orders issued by the

15  undersigned or the Ninth Circuit in this action, (ECF Nos. 111–113). In fact, many of the

16  documents include discussion of claims and defendants completely unrelated to the instant action.

17  (ECF Nos. 106, 108–110, 115, 119.) To the extent Plaintiff discusses the claims actually at issue

18  in this case, he does so in a generalized and conclusory manner, without reference to evidence or

19  exhibits to support any of the facts which he repeatedly claims are material and in dispute.

20        Plaintiff may not defeat Defendants' motion for summary judgment by simply filing a

21  large number of documents with his opposition. "[E]ven if an affidavit is on file, a district court

22  need not consider it in opposition to summary judgment unless it is brought to the district court's

23  attention in the opposition to summary judgment." Carmen v. San Francisco Unified School

24  Dist., 237 F.3d 1026, 1029 (9th Cir. 2001). In other words, the Court will not consider any

25  affidavits, declarations, or other documents as evidence in support of Plaintiff's opposition unless

26  Plaintiff, in an opposition brief, identifies what the documents are and where they came from,

27  cites to the page and particular portions of the documents that he feels support his opposition, and

28  sets forth arguments explaining how each document supports the arguments and allegations made

                                          3

in his brief. "[A] district court is 'not required to comb the record to find some reason to deny a motion for summary judgment.'" Id. (quoting Forsberg v. Pacific N.W. Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir. 1988)). Although a Court may consider materials that are not cited, see Federal Rule of Civil Procedure 56(c)(3), materials submitted that are not specifically cited to and accompanied with arguments explaining how the cited materials support a position need not be considered.

Pursuant to the Court's review of Plaintiff's various supplemental oppositions, the Court finds that the contents do not materially alter the findings and recommendations that the Court will make regarding Defendants' motion for summary judgment, detailed below.

**III.    Legal Standard**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Id. (citing Celotex, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. Id. at 929; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. See Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

///

///

///

///

///

1    **IV.    Discussion**

2           **A.    Undisputed Material Facts ("UMF")**[3]

3           1.     On July 28, 2014,[4] Plaintiff was seen by a surgeon in the in-house surgery clinic—

4    reporting low back and hand pain of 8 on a scale of 1 to 10.  (Szabo Decl. ¶ 5a; CSH 01141.)

5           2.     On July 23, 2014, Registered Nurse Niewczas notes: June 18, 2014, orthopaedic

6    consult for right hand wrist pain that is worsening, throbbing, tender to touch, swelling, interfere

7    with sleep, recommendation carpal tunnel release; June 30, 2014, referred to orthopedic carpal

8    tunnel (CTS) release surgery, patient is has more analgesic choices than he is using, staff presents

9    patient with different options, also encouraged to use non-pharmacological pain management

10   interventions, had been evaluated by podiatrist on July 7, 2014, ibuprofen was discontinued and

11   naproxen was prescribed.  (Szabo Decl. ¶ 5b; CSH 01147.)

12          3.     On June 23, 2014, Plaintiff reported his back pain as chronic—facet syndrome, the

13   patient is refusing pain management, just want to see neurosurgery for injection, referred to

14   neurosurgeon; right wrist pain—May 19, 2014, Computed tomography (CT) of right upper

15   extremity postoperative changes with resection of trapezium with the articulation of the base of

16   the first metacarpal with the trapezoid; June 18, 2014, had orthopedic appointment.  (Szabo Decl.

17   ¶ 5c; CSH 01183.)

18          4.     On June 23, 2014, Plaintiff was physically active.  (Szabo Decl. ¶ 5d; CSH

19   01186.)

20          5.     On May 22, 2014 Plaintiff was scheduled to leave the facility.  He was up and

21   ambulatory.  Wrists and ankles are free of any injury.  (Szabo Decl. ¶ 5e; CSH 01209.)

22          6.     On May 14, 2014, Plaintiff's reported right wrist pain was waking him at night.

---

[3] See Defendants' Separate Statement of Undisputed Material Facts.  (ECF No. 79-2.)  Plaintiff did not comply with the rules in preparing his opposition, including by failing to provide a separate statement of undisputed facts.  Local Rule 260(a).  As a result, Defendants' Separate Statement of Undisputed Material Facts is accepted except where brought into dispute by Plaintiff's opposition, signed under penalty of perjury.  See Johnson v. Meltzer, 134 F.3d 1393, 1399–1400 (9th Cir. 1998).  Unless otherwise indicated, disputed and immaterial facts are omitted from this statement and relevant objections are overruled.

[4] The Court's list of Undisputed Material Facts is not presented in chronological order, as this Court's presentation of facts follows the order presented in Defendants' Separate Statement of Undisputed Material Facts and the underlying evidence cited in support.  In the interest of judicial economy, the Court did not attempt to reorder the facts and the associated evidence.

(Szabo Decl. ¶ 5f; CSH 01225.)

7.     On April 22, 2014, Plaintiff was seen by his primary care provider with complaints of right wrist discomfort (chronic).  An orthopaedic consult was requested on April 8, 2014. Plaintiff was noted as suffering from carpal tunnel in his right wrist.  Lidocaine patch 5% right wrist was needed every 12 hours.  (Szabo Decl. ¶ 5g; CSH 01245, 07746, 07748, 07880.)

8.     On March 5, 2014, Plaintiff's physical exam showed no right hand swelling, no discoloration, radial pulses present bilaterally, full range of motion bilaterally.  His pain in right hand wakes him up at 2 AM.  (Szabo Decl. ¶ 5h; CSH 01339.)

9.     On February 11, 2014, Plaintiff went to San Luis Obispo for outside medical neurosurgery appointment.  (Szabo Decl. ¶ 5i; CSH 01340.)

10.     On January 14, 2014, Plaintiff reported chronic pain in right hand, back and headache.  (Szabo Decl. ¶ 5j; CSH 01348.)

11.     On August 20, 2014, Plaintiff reported pain of an 8 out of a scale of 1 to 10, lower back, eyes and right arm.  Has ACE wrap to right arm.  (Szabo Decl. ¶ 5k; CSH 01395.)

12.     On August 19, 2014, orthopaedic consultation for right hand wrist pain that is worsening, throbbing tender to touch, swelling interferes with sleep, recommendation carpal tunnel release referred to orthopaedic carpal tunnel release surgery.  (Szabo Decl. ¶ 5l; CSH 01402.)

13.     On August 7, 2014, Plaintiff returned to the facility with an Ace wrap on his right wrist.  Plaintiff stated "I had surgery on my wrist."  It was noted that the incision healed, the skin was intact, and Plaintiff was wearing a lidocaine patch and Ace wrap.  (Szabo Decl. ¶ 5n; CSH 01421.)

14.     On September 23, 2014, Plaintiff went to Fresno for orthopaedic procedure.  He returned after right carpal tunnel release surgery.  Registered Nurse Niewczas notes Plaintiff had a dressing on his right wrist, reported pain as an 8 out of 10, was in no acute distress, and had no signs of compartment syndrome.  (Szabo Decl. ¶ 5o; CSH 01428, 01433.)

15.     On September 24, 2014, right arm with soft case from elbow down to wrist. (Szabo Decl. ¶ 5p; CSH 01485.)

///

16.     On September 25, 2014, Registered Nurse Karanja noted the dressing on Plaintiff's right wrist was dry and clean and he denied numbness or tingling.  On September 27, 2014, Registered Nurse Okeko notes: Plaintiff's right thumb feels slightly numb on top of the knuckle; the dressing on Plaintiff's right wrist was dry and his thumb was pink with good capillary refill.  (Szabo Decl. ¶ 5q; 01498, 01526.)

17.     On October 16, 2014, staff noted an abrasion to Plaintiff's right elbow.  Plaintiff stated he did not know what happened.  The nurse noted Plaintiff's right wrist incision was open to air and healing nicely.  (Szabo Decl. ¶ 5s; CSH 01689.)

18.     October 14 and 15, 2014, Plaintiff was seen by Registered Nurses Padilla and Toledo for a follow-up to his right wrist carpal tunnel release surgery on September 24, 2014.  An approximate 6 cm old incision was noted about the palm of Plaintiff's hand; incision appears to have dehisced—dry/hardened tissue noted throughout the edges of wound; site free skin any signs/symptoms of infection; site air to dry.  Plaintiff's prescription for Norco was renewed.  (Szabo Decl. ¶ 5t; CSH 01700–01705.)

19.     Plaintiff's December 16, 2014, treatment plan notes Plaintiff suffers from arthritis of the MCC joint of his right hand, post traumatic change.  Plaintiff had been evaluated for pain on July 31, 2014, and was on multiple pain medications.  (Szabo Decl. ¶ 5u; CSH 01823.)

20.     Plaintiff's October 23, 2014, monthly conference notes and treatment plan notes Plaintiff's past medical history: Hepatitis C, Right Cerebral infarct, legally blind one eye, obese BMI 39.8, arthritis of MCC joint right hand post traumatic, Hypertension, insomnia, RCTS, Glaucoma, valley fever.  (Szabo Decl. ¶ 5v; CSH 01851–01864.)

21.     May 19, 2014, CT right upper extremity. Findings: Bones: No acute fracture.  Cystic change is present in the base of the thumb metacarpal and there is a surgical clip.  Trapezium is probably surgically resected.  A few bony fragments are present between the base of the thumb and the trapezoid.  Joints: Thumb metacarpal articulates with the trapezoid.  Soft tissues: Normal.  Other: Sagittal and coronal reformatted images are suboptimal.  Conclusion: Postoperative changes with resection of the trapezius with articulation of the base of the first

metacarpal with the trapezoid. (Szabo Decl. ¶ 5w; CSH 01916.)

22. April 27, 2013: February 28, 2013, x-ray right hand: deformity from a remote fracture of the base of the first metacarpal with associated degenerative changes. No significant interval change compared to the prior exam from October 11, 2012. X-ray right wrist: remote fracture of the base of the first metacarpal and probably the trapezoid with associated osteoarthritis. No significant change compared to November 4, 2011.

Arthritis of MCC joint right hand. Orthopaedic consult with Dr. Smith, new orders carried out "Surgery planned arthroplasty of right wrist with interposition Diagnosis osteoarthritis right hand." (October 10, 2012) Complains of "pain, swelling right hand hit bedrail during the night" seen on sick call October 11, 2012. X-ray right hand conclusion "posttraumatic changes and arthritis at the first MCC joint. 11/29/12 non-formulary approval of Voltaren 1% gel topical apply daily to forearms at 2000 x 45 days. Ordered lidocaine patch—helpful, no numeric value offered. October 22, 2012, Right hand thumb splint ordered intact with metal insert patient wears as needed. Patient signed contract for health care appliance with removable metal piece October 22, 2012. (Szabo Decl. ¶ 5x; CSH 03288–03289, 05690.)

23. December 19, 2012, X-ray of left wrist scheduled 8:00 a.m. December 18, 2012, Dr. Tur examined Plaintiff's cyst left wrist. Orthopaedic consult generated. Diagnosis ganglion cyst. Place on non-urgent sick call. (Szabo Decl. ¶ 5y; CSH 05692.)

24. April 4, 2013, Status post Right thumb surgery wrist arthroplasty. (Szabo Decl. ¶ 5z; CSH 03361, 03365–03371.)

25. November 16, 2012, Plaintiff saw Orthopaedic surgeon Dr. Smith: Diagnosis arthritis of MCC joint right hand post traumatic change for surgery and opt-operative exam. On that same date, Dr. Tur prescribed Plaintiff a Lidocaine patch for his right hand and updated the order on November 21, 2012, and December 4, 2012. (Szabo Decl. ¶ 5aa; CSH 03895.)

26. October 20, 2012, Right hand splint right thumb splint x 30 days (with metal inserts). Diagnosed right hand contusion with chronic trauma induced arthritis. Check status of splint q shift x 30 days. October 22, 2012, per Hamrick MD, Right hand thumb splint x 1 week. Diagnosed right hand contusion with chronic trauma induced arthritis. Check status of splint q

shift.  (Szabo Decl. ¶ 5bb; CSH 03896, 03898.)

27.     On October 17, 2012, Dr. Tur ordered Plaintiff a right hand splint for his right thumb for 30 days without metal insert and ordered an orthopaedic consultation and MRI of Plaintiff's right hand.  Diagnosed right MCC joint arthritis injury post traumatic.  (Szabo Decl. ¶ 5cc; CSH 03904, 05696.)

28.     October 11, 2012, an x-ray of Plaintiff's right hand was ordered stat and he was diagnosed with a right hand injury.  (Szabo Decl. ¶ 5dd; CSH 03905.)

29.     On January 2, 2013, Plaintiff was seen by doctor for pain in his right wrist.  The doctor noted right wrist tenderness over the first metacarpophalangeal joint.  MRI cyst and osteoarthritis of first CMC joint.  Diagnosis osteoarthritis.  (Szabo Decl. ¶ 5ff; CSH 03996.)

30.     On December 18, 2012, Dr. Tur saw Plaintiff for complaints of right [LEFT] wrist pain.  Dr. Tur ordered x-rays and referred Plaintiff to the orthopaedist.  (Szabo Decl. ¶ 5gg; CSH 03884, 04000.)

31.     September 17, 2012, Plaintiff had a Right hand complaint.  Dr. Tur prescribed Plaintiff Tylenol for pain for his right hand the next day.  (Szabo Decl. ¶ 5hh; CSH 03903, 04055.)

32.     November 14, 2012, Templeton Orthopaedic.  Right wrist wrapped in ace wrap.  (Szabo Decl. ¶ 5ii; CSH 04084.)

33.     Plaintiff was seen by Dr. Tur on March 27, 2012, who noted Plaintiff was seen by Dr. Baker, neurology, for a nerve conduction study of lower extremities—sensory and motor polyneuropathy.  March 22, 2012, First Orthopaedic surgeon consult Dr. Smith MRI of right shoulder Right AC joint moderate degeneration; blood tests for neuropathy were negative; December 19, 2011, MRA neck normal.  12/19/11 C spine C6 and C7-T1 moderate neural foraminal narrowing; CT maxillofacial: left inferior orbital floor depression with associated soft tissue density likely related to old fracture and scar.  Surgical changes of bilateral globes.  Dr. Tur referred Plaintiff to the pain clinic.  (Szabo Decl. ¶ 5jj; CSH 04039, 05472.)

34.     December 17, 2012, Low back, neck and right hand pain.  Arthritis of right MCC joint.  Orthopaedic surgery arthroplasty right wrist is planned left wrist ganglion consult planned.

(Szabo Decl. ¶ 5kk; CSH 05610, 05617.)

35.     On October 24, 2012, Plaintiff received an MRI of his right hand.  At the time, he had no complaints of pain, but was guarding his right hand, and stated "I hit the frame of my bed."  Swelling was noted between his thumb and first finger of his right hand.  (Szabo Decl. ¶ 5mm; CSH 05676.)

36.     On October 10, 2012, Plaintiff complained of a right hand injury, stating he "hit right hand on bedrail."  An October 11, 2012, x-ray reveals posttraumatic injury arthritic changes right MCC joint.  An MRI of Plaintiff's right hand was ordered on October 14, 2012, and a right thumb splint was ordered on October 22, 2012.  (Szabo Decl. ¶ 5nn; CSH 05687.)

37.     On October 23, 2012, it was noted Plaintiff complained of aching pain to his right thumb.  Swelling was noted at the radial aspect; no bruising.  (Szabo Decl. ¶ 5oo; CSH 05689.)

38.     On October 17, 2012, Plaintiff was seen on sick call status post right hand injury.  An x-ray from October 11, 2012, showed post-traumatic change and arthritis first MCC joint.  Dr. Tur explained to Plaintiff that his x-rays do not show a fracture, but do reveal arthritis.  Dr. Tur referred Plaintiff for an orthopaedic consultation.  (Szabo Decl. ¶ 5pp; CSH 05696, 05703.)

39.     October 11, 2012, Plaintiff reported that he bumped his right hand on the bed frame accidentally while laying down on his bed with the pain level 9/10.  Individual's radial side of his hand near the thumb is swelling tenderness noted, no redness or no bruises of no discoloration noted.  Skin warm and intact.  No open wound noted on the affected area.  Individual stated that "it's getting worse just tonight but it was okay this morning."  When I move it I feel like sharp pain.  Full range of motion of his right hand and fingers.  Individual denies weakness of his right hand, numbness or tingling sensation, reduced range of motion.  Assessed individual's right hand and monitor current condition.  Encouraged individual to utilize pain meds as needed.  Encouraged individual to have rest, apply cold compress and elevate affected hand while resting to improve his blood flow.  Physical change of condition and temporary nursing care plan done.  Place individual for sick call in the morning.  (Szabo Decl. ¶ 5qq; CSH 05703, 05706.)

40.     February 28, 2013, X-ray right hand: Deformity from a remote fracture of the base

of the first metacarpal with associated degenerative changes. No significant interval change compared to the prior exam from October 11, 2012. February 28, 2013, X-ray right wrist: remote fracture of the base of the first metacarpal and probably the trapezoid with associated osteoarthritis. No significant change compared to November 4, 2011. (Szabo Decl. ¶ 5ss.)

41.     On September 25, 2013, Plaintiff was seen by Dr. Nguyen for throbbing right wrist pain. It was noted Plaintiff did not take ordered pain medications. Dr. Nguyen instructed Plaintiff to take Ibuprofen and topical Voltaren as needed and referred him to the pain management clinic. (Szabo Decl. ¶ 5tt; CSH 07769, 07921.)

42.     On August 19, 2013, Plaintiff was seen by a physician complaining of right wrist pain. Plaintiff had physical therapy, but states it did not help and it gave him pain. (Szabo Decl. ¶ 5uu; CSH 07770.)

43.     July 2, 2013, Right wrist pain. (Szabo Decl. ¶ 5vv.)

44.     On July 25, 2013, Plaintiff complained of pain in his right wrist. Norco discontinued and Plaintiff indicated he was willing to decrease the pain medication, but believes that he needs something now. Dr. Nguyen was called and agreed to consider ordering an additional medication for pain. Consideration for surgical or physical therapy follow-up seems indicated also. (Szabo Decl. ¶ 5ww; CSH 07773, 07937.)

45.     Plaintiff was seen on July 29, 2013, and it was noted he has severe osteoarthritis at MCC joint and was status post excision of trapezium interposition arthroplasty. Plaintiff was referred to physical therapy and pain management clinic and prescribed Norco for pain. (Szabo Decl. ¶ 5xx; CSH 07773, 07936.)

46.     Plaintiff was seen on July 1, 2013, where his cast was found to be tight and he had off and on numbness of his thumb. It was noted the case had been in place since April 23, 2013. Await instructions from Dr. Smith. (Szabo Decl. ¶ 5yy; CSH 07775.)

47.     On June 21, 2013, Plaintiff complained of increased pain in right thumb over past several days and occasional numbness and tingling. He was noted to be in a short arm cast with no swelling noted. It was determined that Plaintiff would continue Motrin as needed. Dr. Nguyen prescribed Norco for pain on July 25, 2013. (Szabo Decl. ¶ 5zz; CSH 03708, 03709,

07777, 07942.)

48.     November 5, 2014, Right hand pain.  (Szabo Decl. ¶ 5aaa.)

49.     October 28, 2014, Back pain.  Telephone Order, read back.  Dr. Nguyen.  (Szabo Decl. ¶ 5bbb.)

50.     Plaintiff complained of "throbbing pain" in his right thumb on October 29, 2014.  Dr. Nguyen ordered a cold compress to Plaintiff's right wrist every two hours as needed, as well as Ibuprofen, for pain.  The next day, Dr. Tur ordered a right hand splint for Plaintiff's right thumb for 30 days.  (Szabo Decl. ¶ 5ccc; CSH 05675, 03896, 07827.)

51.     October 11, 2012, X-ray right hand 3 views: Deformity at the base of the first metacarpal with bulky hypertrophy and flattening of the articular margin.  Mild arthritic change at the first metacarpophalangeal joints.  Narrowing at the first MCC joint.  Soft tissue fragmentation at the first MCC joint.  Posttraumatic change and arthritis at the first MCC joint.  (Szabo Decl. ¶ 7a.)

52.     Plaintiff was sent to Templeton Orthopaedic for orthopaedic consultation and x-rays.  November 14, 2012, Plaintiff complained of right hand/wrist pain for three weeks.  Cause: wear and tear, hit on the bed.  No neck pain.  Spurling's test is negative bilaterally.  Enlargement right hand over the MCC joint with movement and crepitance.  Tinel's and carpal compression tests negative bilaterally.  X-rays November 14, 2012: Severe post traumatic osteoarthritis right thumb MCC joint.  Plan: Schedule surgery at patient's convenience.  (Szabo Decl. ¶ 7b; CSH 05652.)

53.     Plaintiff was seen by Dr. Nguyen on April 10, 2013.  It was noted: tenderness over the thumb MCC joint; Tinel's test negative bilateraly; carpal compression test negative bilaterally.  Continue immobilizer.  (Szabo Decl. ¶ 7c; CSH 07967.)

54.     April 24, 2013, Plaintiff's right thumb in spica splint with dressing clean and dry.  Out of splint incisions are healed.  Short arm cast applied.  (Szabo Decl. ¶ 7d.)

55.     Plaintiff's radiographic studies from October 24, 2012, show he had osteoarthritis in his right thumb carpometacarpal joint with what looks like an old Bennett's fracture.  The official reading includes "No evidence of abnormal marrow signal is present to suggest acute

injury." These findings are consistent with posttraumatic osteoarthritis of the first carpometacarpal joint. Plaintiff also had an additional degenerative small cyst at the distal pole of the scaphoid also likely due to osteoarthritis. (Szabo Decl. ¶ 6.)

56.     Plaintiff complained of right hand pain on October 10, 2012, when it was noted that he stated that he "hit his right hand on a bedrail." A detailed medical entry on October 11, 2012, by Registered Nurse Lim noted:

"10/11/12 Individual reported that he bumped his right hand on the bed frame accidently while laying down on his bed with the pain level 9/10. Individual's radial side of his hand near the thumb is swelling tenderness noted, no redness or no bruises of no discoloration noted. Skin warm and intact. No open wound noted on the affected area. Individual stated that "it's getting worse just tonight but it was okay this morning." When I move it I feel like sharp pain. Full [range of motion] of his right hand and fingers. Individual denies weakness of his right hand, numbness or tingling sensation, reduced range of motion. Assessed individual's right hand and monitor current condition. Encouraged individual to utilize pain meds [as needed]. Encouraged individual to have rest, apply cold compress… and elevate affected hand while resting to improve his blood flow. Physical change of condition and Temporary nursing care plan done. Place individual for sick call in AM."

X-rays were obtained on October 11, 2012, which revealed old posttraumatic injury arthritic changes to the right carpometacarpal joint. An MRI was ordered on October 14, 2012, and a right thumb splint was ordered on October 22, 2012, with metal insert for Plaintiff to wear as needed. Plaintiff signed a contract for the health care appliance with removable metal piece on October 22, 2012. On November 29, 2012, Plaintiff was prescribed with non-formulary approval of Voltaren 1% gel and lidocaine patches for his thumb pain. On October 17, 2012, the medical records indicate that Plaintiff was seen on sick call and his primary care provider explained that his x-rays did not show an acute fracture, but rather demonstrated arthritis and an orthopaedic consult was generated. A medical note entry on October 24, 2012, states: "right hand thumb contusion with chronic trauma induced arthritis. Check status of splint q shift." An MRI of the right hand was performed on October 24, 2012. On November 16, 2012, Plaintiff was examined

by Dr. Smith, an external orthopaedic surgeon, in consultation for his right thumb arthritis. A chart entry notes the arthritis to be a pre-existing condition:

"2/28/13 X-ray right hand: Deformity from a remote fracture of the base of the 1st metacarpal with associated degenerative changes. No significant interval change compared to the prior exam from October 11, 2012. 2/28/13 x-ray right wrist: remote fracture of the base of the 1st metacarpal and probably the trapezoid with associated osteoarthritis. No significant change compared to November 4, 2011."

Dr. Smith performed a reconstructive arthroplasty of Plaintiff's right thumb basilar joint on April 4, 2013. Plaintiff had a preexisting intra-articular displaced well healed fracture of the base of his right thumb of his right thumb metacarpal also known as a "Bennett's fracture." The x-rays demonstrated marked arthritic changes in the joint indicating that this injury occurred at least several years before 2012 and was in all likelihood untreated. (Szabo Decl. ¶ 8; CSH 05706, 05708.)

57. Given that it takes several years for the radiographic changes to occur and the MRI on October 24, 2012, also confirmed no acute changes, Plaintiff aggravated an arthritic joint with minimal trauma causing new symptoms. This sequence is very common in many patients who often attribute the minor trauma to being the cause of the arthritis. All medical care was appropriate and proper attention was given to Plaintiff. There was no negligence or lack of medical care offered to Plaintiff regarding the care of his right hand. (Szabo Decl. ¶ 9.)

**B.    Analysis**

"Involuntarily committed patients in state mental health hospitals have a Fourteenth Amendment due process right to be provided safe conditions by the hospital administrators . . . . [W]hether a hospital administrator has violated a patient's constitutional rights is determined by whether the administrator's conduct diverges from that of a reasonable professional." Mitchell v. Washington, 818 F.3d 436, 443 (9th Cir. 2016) (quoting Ammons v. Wash. Dep't. of Soc. & Health Servs., 648 F.3d 1020, 1027 (9th Cir. 2011)).

In other words, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from

15

accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id., (quoting Youngberg v. Romeo, 457 U.S. 307, 323 (1982)). See Parham v. J. R., 442 U.S. 584, 608, n.16 (1979) (In limiting judicial review of medical decisions made by professionals, "it is incumbent on courts to design procedures that protect the rights of the individual without unduly burdening the legitimate efforts of the states to deal with difficult social problems"); see also Rhodes v. Chapman, 452 U.S. 337, 352 (1981) ("[C]ourts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system . . ."); Bell v. Wolfish, 441 U.S. 520, 539 (1979) (In the context of conditions of confinement of pretrial detainees, "[c]ourts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility"); Wolff v. McDonnell, 418 U.S. 539, 556 (1974) (In considering a procedural due process claim in the context of prison, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application").

This standard has been referred to as the "Youngberg professional judgment standard." Ammons, 648 F.3d at 1027. "The Youngberg standard differs from the 'deliberate indifference' standard used in Eighth Amendment cruel and unusual punishment cases, in that '[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" Mitchell, 818 F.3d at 443 (citing Ammons, 648 F.3d at 1027 (quoting Youngberg, 457 U.S. at 321–22) (internal quotation marks omitted)). The professional judgment standard is an objective standard and it equates "to that required in ordinary tort cases for a finding of conscious indifference amounting to gross negligence." Ammons, 648 F.3d at 1029. Thus, a civil detainee's claim that is cognizable under the Youngberg standard will also state a cognizable gross negligence claim under California law and vice versa.

"Gross negligence is pleaded by alleging the traditional elements of negligence: duty,

16

breach, causation, and damages.  [Citation omitted in <u>Chavez</u>.]  However, to set forth a claim for "gross negligence" the plaintiff must "also allege conduct by the defendant involving either ' want of even scant care'" or "an extreme departure from the ordinary standard of conduct." <u>Chavez v. 24 Hour Fitness USA, Inc.</u>, 238 Cal. App. 4th 632, 640 (2015) (quoting <u>Rosencrans v. Dover Images, Ltd.</u>, 192 Cal. App. 4th 1072, 1082 (2011); <u>City of Santa Barbara v. Superior Court</u>, 41 Cal. 4th 747, 754 (2007)  Gross negligence "connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results . . . ."  <u>Chavez</u>, 238 Cal. App. 4th at 640 (quoting <u>Eriksson v. Nunnink</u>, 191 Cal. App .4th 826, 857 (2011)).

In their motion for summary judgment, Defendants contend that Plaintiff's claims do not rise to the level of constitutional violations.  Defendants argue that in prescribing Plaintiff non-steroid anti-inflammatory drugs for his pain, Defendants provided all medical care that was appropriate and proper attention was given to Plaintiff regarding the care of his right hand.  As to the actions of Dr. Tur, Plaintiff's medical records show that he received prompt medical care upon injuring his right hand on October 10, 2012, and Dr. Tur did not deny Plaintiff appropriate medical treatment for a year.  To the extent Plaintiff complains that he did not receive surgery until April 2013, causing him further significant injury and unnecessary and wanton pain, Defendants argue that Dr. Tur promptly referred Plaintiff to an outside specialist, Dr. Smith, and Dr. Tur was then not responsible for determining Plaintiff's need for surgery or scheduling when that surgery would be performed.  (ECF No. 79-1.)

As to Defendant Nguyen, Defendants argue that nothing in Plaintiff's medical records corroborates Plaintiff's claim that he fractured his hand, was x-rayed, and that Defendant Nguyen examined the hand and failed to treat an obvious scaphoid[5] fracture in November 2013.  In fact, Plaintiff's medical records show that he received a reconstructive arthroplasty from Dr. Smith on his right hand in April 2013, and they do not show another injury to Plaintiff's right hand until June 2014, when he received another orthopaedic consult that resulted in a recommendation that Plaintiff undergo a carpal tunnel release surgery on his right wrist.  (<u>Id.</u>)

---

[5] Defendants repeatedly reference a "scaffold fracture" in their brief, however it appears that they intended to reference a "scaphoid fracture."

Plaintiff, in turn, has submitted an opposition that largely ignores the substance of Defendants' motion. The one sentence related to the merits of the claims in this action refers to "a xray attached which clearly showed the bone missing that connects to the wrist and the thumb was severly and extreme diliberate indifference to my serious medical needs that deprived me and violated my secured and guaranteed rights by the United States Constitution that caused unwanted pain and suffering for over one full year . . ." (ECF No. 100, pp. 2–3 (unedited text).) However, no x-ray is attached to the filing, nor was one attached to any of Plaintiff's various supplemental oppositions, as discussed above. The remainder of Plaintiff's opposition relates to his objections regarding Defendant Tur's service and related issues, and claims and allegations unrelated to the instant action.

As discussed at length, Plaintiff had many opportunities to fully oppose Defendants' summary judgment motion. The motion was originally filed on September 28, 2018, and re-served on January 14, 2019. (ECF Nos. 79, 86, 87.) The Court granted Plaintiff several extensions of time before he finally filed his opposition four months later, on May 14, 2019. (ECF No. 100.) Finally, despite failing to seek additional extensions of time or leave to file supplemental oppositions, Plaintiff filed fourteen additional documents purporting to oppose the pending summary judgment motion. (ECF Nos. 105–114, 115–116, 118–119.)

In spite of these additional filings, Plaintiff has failed to present more than conclusory allegations along with unincorporated or irrelevant exhibits to attempt to demonstrate that there exists a dispute of material facts in this case. See Rivera v. AMTRAK, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment.").

### 1.    Dr. Tur

Plaintiff alleges that in April 2012, Dr. Tur discovered a scaphoid fracture after reviewing x-rays of Plaintiff's right hand, and then delayed treatment for a year before Plaintiff finally underwent surgery in April 2013. During that time, Plaintiff was prescribed only Tylenol, which did not reduce his pain, and Dr. Tur's treatment decisions were therefore a substantial departure from accepted professional judgment. (Third Amended Complaint, ECF No. 25, Claim 2.)

The evidence before the Court reveals that Plaintiff's earliest complaint of hand pain was on September 17 or 18, 2012, when Dr. Tur diagnosed him with arthritis of MCC of joint and prescribed him Tylenol for pain. UMF 31; CSH 03903, 04055. Plaintiff's next complaint of a more serious injury to his right hand was on October 10, 2012, after Plaintiff hit his hand on his bedrail. UMF 22. Plaintiff was seen by medical the next day, and an x-ray ordered by Dr. Tur revealed "posttraumatic changes and arthritis at the first MCC joint." Id., UMF 28. No scaphoid fracture was noted at this time. UMF 22, 51, 56. Plaintiff was seen by his primary care provider, Dr. Tur, on October 17, 2012, when it was explained that Plaintiff's x-rays did not show an acute fracture, but rather demonstrated arthritis. UMF 56. Defendant Tur also ordered an orthopaedic consultation and MRI of Plaintiff's right hand. UMF 27. On October 22, 2012, Plaintiff was ordered a right hand thumb splint that Plaintiff could wear as needed. UMF 22. The medical records indicate that Plaintiff received additional follow up appointments for his right hand before his April 2013 surgery, including November 21, 2012 and December 4, 2012 prescriptions from Dr. Tur for Lidocaine patches, and a December 17, 2012 visit where his upcoming right wrist surgery was noted. UMF 25, 34.

Plaintiff was also seen by Templeton Orthopaedic and the orthopedic surgeon, Dr. Smith, throughout November 2012, when he was again diagnosed with "arthritis of MCC joint right hand post traumatic change," had his right wrist wrapped in an ace wrap, and received more x-rays revealing "severe post traumatic osteoarthritis right thumb MCC joint." UMF 25, 32, 52. Following his orthopedic consultation on November 14, 2012, the plan was to "schedule surgery at patient's convenience." UMF 52.

While a February 28, 2013 x-ray of Plaintiff's right hand notes a "remote fracture of the base of the 1st metacarpal and probably the trapezoid with associated osteoarthritis," the medical records also note that there was "[n]o significant change compared to November 4, 2011," several prior to Plaintiff's bedrail injury in October 2012. UMF 56. According to Dr. Szabo's professional opinion, the x-rays demonstrated marked arthritic changes in the joint, indicating that the injury occurred at least several years before 2012 and was in all likelihood untreated. UMF 56; Szabo Decl. ¶ 8. In addition, the arthritis is noted as a pre-existing condition that was

1  aggravated by the minimal trauma of hitting his hand against the bedrail in October 2012, rather

2  than being the cause of the arthritis and Plaintiff's ongoing complaints of discomfort and pain in

3  his right hand. UMF 57.

4        As Plaintiff has presented only conclusory allegations, unsupported by evidence in the

5  record, that he was suffering from a scaphoid fracture in his right hand that went untreated by

6  anything other than Tylenol for a year, the Court finds that Defendants have carried their burden

7  to show that Dr. Tur acted reasonably in his treatment of Plaintiff's right hand, and Plaintiff has

8  failed to establish any dispute of material fact as to this claim. Dr. Tur treated Plaintiff's pain

9  immediately following Plaintiff hitting his hand against the bedrail, by prescribing pain

10  medication, Lidocaine patches, a splint, referring Plaintiff for x-rays and an MRI, and referring

11  Plaintiff to an orthopaedic specialist who could evaluate Plaintiff's need for surgery. Plaintiff has

12  further provided no evidence that any delay in his hand surgery was the result of any action or

13  inaction by Dr. Tur.

14                    **2.      Defendant Nguyen**

15        Plaintiff alleges that on November 20, 2013, Defendant Nguyen saw a right-hand

16  scaphoid fracture on Plaintiff's x-rays, and Plaintiff's hand swelled up. Defendant Nguyen

17  prescribed Plaintiff only Tylenol and Motrin, which did not alleviate Plaintiff's pain, and delayed

18  treating Plaintiff's right-hand scaphoid fracture for one year, resulting in further significant injury

19  and wanton infliction of pain. Plaintiff alleges that Defendant Nguyen knew his treatment

20  decisions were substantial departures from accepted professional judgment. (Third Amended

21  Complaint, ECF No. 25, Claim 6.)

22        As discussed above, none of Plaintiff's medical records show that he ever had a right-hand

23  x-ray that revealed a scaphoid fracture in his right hand or wrist. While Plaintiff did see

24  Defendant Nguyen regarding pain in his right hand and wrist following his April 2013 surgery,

25  the evidence shows that Defendant Nguyen treated Plaintiff with more than merely Tylenol and

26  Motrin. Defendant Nguyen saw Plaintiff on April 10, 2013, when he noted "tenderness over the

27  thumb MCC joint; Tinel's test negative bilaterally; carpal compression test negative bilaterally"

28  and Plaintiff was ordered to continue immobilizer. UMF 53. On June 21, 2013, Plaintiff

complained of increased pain in his right thumb over the past several days and occasional numbness and tingling. UMF 47. Plaintiff was in a short arm cast and no swelling was noted. Id. Plaintiff was told to continue Motrin as needed. Id. On July 25, 2013, Plaintiff complained of right wrist pain and Plaintiff indicated he was willing to decrease his pain medication but believed he needed something new. UMF 44. Defendant Nguyen agreed to consider ordering an additional medication for pain and considered Plaintiff for surgical or physical therapy follow-up. Id. Defendant Nguyen also prescribed Norco for the pain. UMF 47. On September 25, 2013, Plaintiff complained of throbbing right wrist pain, and Defendant Nguyen noted that Plaintiff did not take ordered pain medications, but nevertheless instructed Plaintiff to take Ibuprofen and topical Voltaren as needed and referred him to the pain management clinic. UMF 41. Id. Plaintiff was ultimately referred to an orthopaedic consultation in June 2014 for a carpal tunnel release surgery, though it was also noted that "patient [has] more analgesic choices than he is using, staff presents patient with different options, also encouraged to use non-pharmacological pain management interventions . . . ibuprofen was discontinued and naproxen was prescribed." UMF 2. On October 29, 2014, when Plaintiff complained of "throbbing pain" in his right thumb, Defendant Nguyen ordered a cold compress to Plaintiff's right wrist every two hours as needed, as well as Ibuprofen for pain. UMF 50. The next day, Dr. Tur ordered a right-hand splint for Plaintiff's right thumb for 30 days.

Again, Plaintiff has presented only conclusory allegations, unsupported by evidence in the record, that he ever suffered from a scaphoid fracture in his right hand that was discovered by Defendant Nguyen but left untreated for a year. Defendant Nguyen treated Plaintiff's complaints of pain in his right hand and wrist with a variety of non-steroidal anti-inflammatory drugs as well as narcotic medications, and recommended non-pharmocological treatments such as surgery and physical therapy. Thus, the Court finds that Defendants have carried their burden to show that Defendant Nguyen acted in an objectively reasonable manner in his treatment of Plaintiff's right hand, and Plaintiff has failed to establish any dispute of material fact as to this claim.

///

**V.    Conclusion and Recommendations**

For the reasons explained above, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claim that Defendants substantially departed from accepted professional judgment in providing treatment for his right hand, as Plaintiff has not established the existence of a factual dispute on this claim.

Accordingly, IT IS HEREBY RECOMMENDED that Defendants' motion for summary judgment, (ECF No. 79), be granted.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **March 5, 2020**                                    /s/ Barbara A. McAuliffe
                                                        UNITED STATES MAGISTRATE JUDGE